May it please the court, my name is Shakira Sanders and I, along with Camille Gates, represent the petitioner Sam Malkandi in this matter. We respectfully request that this court grant the petition for review and release Mr. Malkandi from the custody of Immigration Customs and Enforcement. This case underscores the important duty of circuit courts to independently review the grounds under which an alien is denied asylum relief, especially whereas here Mr. Malkandi has been confined to a maximum security prison and separated from his wife and two children for almost three years. There are two critical issues in this case. The first is whether substantial evidence supports the BIA's finding that Mr. Malkandi is a danger to national security. The issue of whether the government has presented sufficient evidence to support its claim that an alien is a danger is a question of law. The second is whether there is substantial evidence to support the immigration judge's denial of asylum, withholding of removal, and withholding of removal under the Convention Against Torture. Although the BIA did not rule on this issue, this court can review the immigration judge's determination because the record is clear that Mr. Malkandi would be persecuted if returned to Iraq. The finding that Mr. Malkandi is a danger to national security was based on two conclusions. The first was that by assisting Salah Mohammed in making a medical appointment, the BIA concluded that Mr. Malkandi acted as a travel facilitator for al Qaeda. Second, Mr. Malkandi was found to be not credible when he denied any knowledge of collat or any association with al Qaeda. The BIA's finding with regards to whether Mr. Malkandi was a travel facilitator was based on the testimony of three government agents. According to the BIA, the agents' testimony raised a sufficient suspicion that Mr. Malkandi was a danger to national security. As a threshold matter, the statutory bar to asylum, withholding of removal, and withholding of removal under the Convention Against Torture requires evidence that a reasonable person would believe, not suspect, that an alien poses a danger. Next, the testimony that Mr. Malkandi acted as a travel facilitator was not based on personal knowledge, was unreliable and speculative. For example, Agent Marks testified that only a very small group of people within al Qaeda handled documents and arranged travel. And Agent Smalley testified that Mr. Malkandi was highly trusted by al Qaeda and the al Qaeda organizations to make travel arrangements. When asked directly on cross-examination whether al Qaeda, whether travel arrangers, who travel arrangers were within al Qaeda, Agent Marks could not give a definitive answer. He could not and did not answer the question or provide any names. He only testified that he was not at liberty to say. Most tellingly, he did not name Mr. Malkandi as a travel arranger. Agent Smalley admitted on cross-examination that he was not aware of any ties that Mr. Malkandi had with al Qaeda, and that he didn't know who trusted whom within the al Qaeda organization, or that he knew anything about what Mr. Malkandi was doing. Agent Marks also testified that Mr. Malkandi was to assist Kalad's entry into the United States, and that he provided documents in support of Agent or documents in support of Kalad's visa application. However, both the 9-11 report and the terrorist travel report stated that no supporting documentation was ever submitted in connection with Mr. Kalad's entry into the United States. Agent Donovan also testified that Mr. Malkandi was to assist Kalad's entry into the United States, and that he provided documents in support of Kalad's entry into the United States. Now, the next day he voluntarily went in and told them, last night I spoke to my wife. She reminded me that we did make this appointment for Salah Muhammad, and that that letter may have been sent to my house. I don't remember it. I don't have a copy of it. And what is the matter? I mean, that's now his testimony, is that he acknowledges my concern is that he acknowledges the very thing the government in effect charges him with knowledge. Correct? No, he doesn't acknowledge that he had a close association with him. No, I mean, he doesn't acknowledge, but there is Bothell, there is the letter, there is the health care company. All of that is undisputed, correct? Correct. It's undisputed that Bothell, Washington was listed on Kalad's visa application. It's undisputed that Mr. Malkandi was to assist Kalad's entry into the United States. The address is not listed on Mr. Kalad's visa application. It only says Bothell, Washington. And what's listed on the letter? The letter is addressed to Salah Muhammad, care of Salbaz Muhammad, which is Mr. Malkandi's former name, and the address that is listed was the address where Mr. Malkandi and his family lived at that time. So there's no doubt that he arranged to make the appointment for Kalad. There's no doubt about that. There's no doubt that he got, the letter was sent to him that would have gotten Kalad into the country. The only issue is whether his story, that he did this innocently, is to be believed. Correct. And the new rules on credibility in the Real ID Act say that you can determine the information that you want to share. There's an inherent plausibility of the applicant's account. And so it seems to me that one issue is, is it plausible that the, your client ran into somebody who was an Al-Qaeda operative, who then asked him to make this appointment and get the letter that would get Kalad into the country? Now, is that a plausible story? That plus combined with the fact that when he made the arrangements, then Kalad called him and said, didn't say anything about getting the letter, but said, how much is it going to cost to get this? And then he was told how much it would cost, and he said, gee, that's a lot of money. And that's the last there was of this, I assume because Kalad was arrested. Now, is that a plausible story? And you might take both views of whether it's plausible. The BIA doesn't think that's a plausible story. And that is one of the bases for a finding of a lack of credibility. And the question is, can we overturn that determination by saying that if there's a compelling case, that that is a plausible story? Answer to your question, I have a two-part answer. The first is that it is the government who had the actual burden of proof in this case to show that Mr. Malkindy was a danger to national security. So even if Mr. Malkindy is found to be not credible, the government's evidence still has to amount to that which is sufficient to show that Mr. Malkindy was a danger to national security. And this court can review, that is a question of law, that this court reviews de novo. The second is whether or not Mr. Malkindy's question was plausible, or his testimony was plausible. Well, let's start with the first, and then we'll go to the second. Okay. On the first, if you find it's not plausible, then you have to find that he was assisting Al-Qaeda by making this appointment, getting this letter, and then he was assisting Al-Qaeda. In order to try to help collide into the country. So that leaves you with a fairly tough position, if that's the case. Am I wrong about that? That if the story isn't credible, because it's not plausible, that the other inference you have to draw is that he made this appointment for this Al-Qaeda operative, in order to assist him. No. I think even if his story is not plausible, you still look to see if there is actual evidence that he did know that Mr. Calab was Salah Muhammad. I think even if his story is... At least circumstantial evidence of that, isn't there? I don't think there is any circumstantial evidence of that. What about the expert testimony of the agent that, well, Al-Qaeda operatives only rely on a small handful of trusted people to make their travel arrangements? That is evidence. That's testimony, but that testimony is not... You and I may not choose to believe it, but the BIA can believe it. Well, I think the BIA can believe that Al-Qaeda does rely on a small handful of people to make travel arrangements. But there's certainly nothing there to show that Mr. Malkandi ever made any travel arrangements, ever sent any kind of documents in support of Mr. Calab's visa application. And if you look at that testimony, all of those agents testify that they had no idea what Mr. Malkandi was doing, what connections he had with Al-Qaeda, or that he had actually made any travel arrangements in support. They only testified as far as their suspicions or what may have happened. There was nothing submitted by the government. I have to have reasonable ground. So his credibility finding is a foundation, because if he's found to be not credible, then his denials about, well, I don't know anything, I just happened to meet some guy in a shopping mall, and then I went to see him. And I think he's been in a lot of trouble. He's been arrested, and he's been arrested and did this. So the whole predicate for his case seems to crumble if you don't believe him, it seems to me. And because then you have all this other testimony that's undisputed, and then you have the undisputed testimony plus a witness deemed incredible, if that were to be upheld. It's not so hard to get out of when you look at that actual finding that he was not credible. The first thing that the BIA relied upon were the misstatements that Mr. Malkandi made in support of his refugee status. Now, under the new rule, under the Real ID Act, those statements can be used as a basis for finding a petitioner not to be credible. However, in this case, but the Real ID Act did not overrule any of those statements. You can look at anything that says that you look at why those statements were made, the circumstances under which those statements are made. And in this case, it's clear that Mr. Malkandi made those misstatements because he knew his refugee application would have never been granted if he didn't embellish his story. He had a one-year... We got off to that other set. I interrupted you when I posed that issue to you about if the plausibility finding was all right. I mean, if we can't overturn the inherent implausibility of the story. And he said, I have two answers to that. And you gave the first, and I said, let's stop. Do you remember what the second was? Well, the second one was getting into the arguments about whether or not his story was implausible and the adverse credibility finding. Do you think that we can find that a ruling that it's implausible is so wrong that we're compelled to overturn it? Yes, you can. I mean, that's not a full basis. I mean, one of the things that the BIA talked about with immigration judges' comments about his demeanor about this whole topic, and that's one of the things that were kind of hard-pressed to second-guess. He was very precise about some of these things, leaving Iraq and going to other countries. But then all of a sudden he gets squishy, basically, when we get to the heart of the matter. Under the Real ID Act, what authority would we have to discount that finding? Well, first, I'd like to say that I have about four minutes of my time left, so I would like to reserve some for rebuttal. But I'll answer your question. First, if you look at the case law pre-Real ID Act, certain cases of this court, and I think Tirico's is one of the cases, that just because someone has a memory lapse in their testimony does not mean that they're being evasive. The second thing is that you can look at the record to determine yourself whether Mr. Malkondi's answers were evasive. And when you look at things that just sort of out of the clear blue, meeting somebody in a shopping mall and then arranging for medical care, that's just the kind of thing that you kind of forget. And then one day you talk to your wife and say, oh, yeah. I mean, that's where the... Well, it wasn't... Well, first of all, when you look at his testimony, he testified about meeting this individual at the mall. He didn't remember exact names. The same thing with regards to his refugee status. He was a refugee grant in the U.N. He remembered all those interviews, and that's what the BIA, where the BIA found him to be incredible. Now, the second part of your question is that it wasn't a week later or two weeks later that he went back to the government and stated that he remembered making an appointment for Salah Muhammad. It was the very next day, and he went in voluntarily. Which certainly shows a certain amount of candor on his part, which is a factor under the REAL-ID Act. Now, also, the REAL-ID Act requires you still to look at the totality of the circumstances and all of the relevant factors. In this case, by only honing in on an alleged evasiveness and an alleged implausibility. And if I can get back to that point for another second. Agent Smalley testified that it was implausible that he met Mr. Rawat in the mall, because they didn't find any evidence that he had entered into the United States. But if you look at the terrorist travel report, there is no way anybody could have known whether any al Qaeda operatives were entering into the country at that time, because this country wasn't keeping track of it. So I think Agent Smalley's testimony on that point is suspect, at the very least. And it does not go to show that Mr. Malkindi's testimony was not true. Unless this Court has any other questions, I will reserve the rest of my time. We'll give you a few minutes, Your Honor. May it please the Court. My name is Bill Peachy, and I represent the Attorney General in this appeal. As the Court correctly recognized, the issue in this case is whether, under the new REAL ID Act standards, Mr. Malkindi's excuse is credible. And it's simply not. It's not for three reasons. His past lies, the admissions to his conduct, and his implausible story with regard to his conduct with Malkindi. Addressing the first issue, Mr. Malkindi has created and crafted and persisted in lies, not for the purpose of escaping harm, but for the purpose of entering the United States and advancing his immigration status. He has acknowledged lies he used to try and become a citizen of this country. He wasn't embellishing, as counsel states, a story because he feared something. He didn't have a basis for a claim. He had to make something up out of whole cloth, and that's what he did. And he used that to enter this country. In this case... Do you agree that even under the REAL ID Act, if you have somebody like one of the cases we had before of a woman escaping female genital mutilation, but she felt she had to align herself with this guy in order to get out of the country and escape that situation, we could still look at that even if the person lied and determine that that wouldn't undermine your credibility in that kind of a situation? You can consider the past lies in the determination of the national security bar. And you're correct. But it's not an absolute disqualifier that you lied before. No, you have to consider the totality of the circumstances. And that's what the REAL ID Act says, that's what the case law was before, and that's what the board acknowledged it did. It spells out. The REAL ID Act requires these things, and we've looked at the totality of the circumstances, all relevant factors, and based on all of that, we determined that there is a reasonable basis to conclude that he... There are reasonable grounds to conclude that Mr. Mulcahy is a danger to national security. And that's supported, because his past lies aren't like the lies in the cases cited, the Aquinamonde, Aguilar, Cora, Tresillo, cited by counsel, and the case your Honor was just referring to, I believe it's the Unaroro from the Tenth Circuit. Those are all pre-REAL ID cases. Those all relate to individuals who had a fear, and they embellished their story for the purpose of getting into the country. And there's no indication they continued with it. Here, we've got an individual who had no basis to come to the country, made a story up out of whole cloth in order to get into this country and continue to republish those lies to get citizenship, an attempt to get citizenship. This is the type of person that for national security... Well, his story is not any different than hundreds of others. Because lots of people make those claims, you know what I mean. A good percentage of asylum applicants are turned down on credibility reasons, right? But still, when we review those, as Judge McEwen says, if they told a little fib to get into this country, we discount that. Well, here... Factually, this case, these aren't little lies. This is a totally fabricated, not an embellished story. This is a totally fabricated story. And this is the type of individual that in the post-9-11 era we should be concerned about. Somebody who has no legitimate claim to persecution, who has created a story for the purpose of entering this country. And the only way we found out that he was involved in assisting a terrorist in the terrorist's efforts to enter this country was because that terrorist was arrested. If that hadn't happened, we likely would not have known about this. So yes, the court can and may consider and should consider the past lies. Second, as the court also recognized, there's no dispute. The actions that Mr. Mulcanty took in his efforts to assist Khaled in entering the country. The issue is whether it was knowingly or unknowingly. The issue is whether he... Knew that he was helping a terrorist. There's no dispute about the facts. No, there's not. And his past lack of credibility and the implausibility of that story provide certainly enough for the board to conclude that there's reasonable grounds to conclude that he is or to consider him as a danger to national security. Ms. Sanders points out, well, even if you agree that his story was not credible, his story concerning his interaction with what's the guy's name? Khaled. You know, you still... That's not affirmative evidence that he's a national security threat. That just says this story is not true. Is that one of her lines of defense? Right. Well, I believe one of her lines of defense is that you should credit him for coming clean as they characterize. I would not characterize it that way on his six years of past lies because... Well, that was a different point. Yeah. In other words, even if even if we agree that, well, you shouldn't credit this story about, you know, he didn't know what he was doing. It's still not affirmative proof that he's a national security threat. On its own, it's not. Yeah. On its own. That's correct, Your Honor, yes. Well, then is there independent evidence that he's a national, you know, that constitutes reasonable grounds that he's a national security threat? Absolutely. And then the threshold is intentionally very low. Congress set at a very low probable cause standard to... What is, I mean, you say that if you find the story is incredible, that's not enough. What else is it that you say you're relying on? Well, there are two stories that are incredible, and there are a number of things. And I can list them for you, Your Honor. First of all, his past... No, no, I'm talking about the story about Kavad. He got the, made the appointment, got the letter for him, and you don't believe that. That's not true. That's correct, Your Honor. That doesn't establish enough, you say. I'm sorry, I was referring to the earlier... I'm sorry if I misunderstood. I thought we were referring to the role of his earlier lies. No, no, we're not talking about the earlier lies, as I understand the question. We're talking about if you find this story implausible, that he met this person who asked him to make the appointment, get the letter, if you find that's not a plausible story, I thought that meant that the other version, explanation would have to be that he got it deliberately. That's correct, Your Honor. And that would be enough. Yes, it would be enough, Your Honor. I'm sorry, I misunderstood which set of lies we were talking about. I think that seemed one of your answers, because your opposing counsel said that would not be enough. No, it would be enough, Your Honor. And we have a lot more. We have the 9-11 report that IDs Kallad as a senior al-Qaeda operative. We have Kallad, also in the 9-11 report, also identifying Kallad as Salah Mohammed, the individual that Mr. Mulkandi references. We have Kallad recalling his point of contact in the States as Barzan. He recalled the name sounded like Barzan. And we have Mr. Mulkandi testifying, yeah, my friends call me Barzan. How do you distinguish between him just being duped, basically, by Salah Mohammed, versus knowing or having any know? Because we've got testimony from Joint Terrorism Task Force agents, three of them, and we have the 9-11 report that lay out. Al-Qaeda doesn't operate this way. Al-Qaeda is a very sophisticated organization. They don't rely on a chance encounter in a mall to help get one of their key people into this country. That's just not how they operate. That's why this story doesn't have the ring of truth. And we know there are a number of other indicators that, for instance, when Mr. Mulkandi is confronted with the 9-11 report entry that references Kallad recalling his point of contact being Barzan, and his response is, uh-oh. And then he goes silent. His demeanor changes. We have the 9-11 report outlining this medical cover story as the plan of operation to get Kallad into this country. And we have Mr. Mulkandi admitting to doing this, to contacting the... What were the dates? When was Mr. Kalladi arrested? In Iraq was he? He was arrested in Yemen, Your Honor. In Yemen. When was he arrested? And what's the relationship between that date and the date the letter was sent? He was arrested shortly before 9-11. I believe he was arrested in August, but I'm not... It was a month or two before. When was the letter sent from Novocare? The Novocare letter was sent, Your Honor... It was prior to that time, Your Honor. I'm sorry I'm having a hard time putting my hand on it, but... It's a little puzzling about what happened to the letter. Why was it never sent? Well, we don't know that it wasn't. There was some... I think there's some confusion in Posting Council's discussion. There were two applications, these applications, by Mr. Kalladi. The first one was rejected for lack of documentation. The note, the little post-it note that was on the Novocare letter, indicates that Mr. Malkondi had called Novocare to say, I need to get a letter because Salah Muhammad, also known as Kalladi, needs this to present to the embassy. So clearly the implication is this is being obtained to overcome the difficulties in the past visa application. However, Mr. Kalladi was arrested. But he made an appointment. So what was the date the appointment was for? The appointment date was... He did not attend the appointment, but... Well, it's not easy to find. But if it was in April, there's a very big gap in the story either way. If it was in April and he wasn't arrested, apparently he never received any letter. That's not in the record. We don't know, Jan. Well... Do you mean Kalladi or... Kalladi. Kalladi, we don't know, Jan. I thought he... Certainly the defendant here testified he didn't receive a letter or he didn't recall receiving a letter. And I gather it's clear from his testimony that he said he never passed it on anyway. And when Kalladi told his story to the government about all his arrangements, he never said anything about getting a letter. Not as indicated in the record, Your Honor. Yes. The letter says that he needed a letter for Saleh Mohammed in Yemen. His embassy needs to know that he has an appointment. And then they say the date of the appointment is May 24, 1999. On the Post-it, yes, Your Honor. That's on the letter, I guess. That's in the letter as opposed to on this Post-it. But Mr. Malkandi says he didn't ever... Did he say he didn't get the letter or he didn't pass it on? He didn't remember whether he got it or not. He didn't remember. I don't remember. Exactly. He didn't remember whether he'd received it. The letter copy that's in the record was retrieved by the JTTF agents from Novacare. From Novacare. Right. And it's addressed to Saleh Mohammed. And that's his address in Bothell, Washington. That's Mr. Malkandi's address, right. And the visa application, Kalladi's visa application,  It has Bothell, Washington. And Kalladi told the people who'd arrested him that his point of contact was in Bothell, Washington. But he never turned in the letter. I'm sorry? Out here we say Bothell. Bothell, I'm sorry. But he never turned in the letter, any letter to the, in order to support his visa application. It's not, I'm sorry, it's not in the record whether that was forwarded. Did I answer the question? I think so. But it was never used. It was never turned over to the embassy. We don't have that in the record. That's correct, Your Honor. There's nothing in the record to indicate that it was. I just want to make sure of one thing. The only basis of the BIA decision was that Malkandi was statutorily ineligible, right? That's correct, Your Honor, yes. For withholding or asylum because of the National Security Bar. That's correct, Your Honor. And then, in turn, that rested on primarily on the lack of credibility of his own testimony. Well, not completely, but to a great extent on the lack of credibility, right? And his admissions to the actual acts. Now. So there's no other basis stated by the BIA that we have to review as for denial of asylum or withholding or anything else. That's correct, Your Honor. It's just the only the national security. And if it were determined that it was not a national security risk or didn't meet that standard, then the case would go back to the BIA for a determination of the asylum and withholding and torture claims on the merits. On any other basis? No. That's correct, Your Honor. The adverse credibility determination could be determinative, but yes. Okay. Well, if there are no further questions, I'll just sum up very briefly. As Your Honors noted, the issue is whether under the Real ID Act standards, which are significantly changed in nature of review, Mr. Malconty's excuse is credible. And the record clearly indicates that it's not. His past lies don't deserve the treatment of the cases that are cited by Petitioner and Acuna Mundi and others. And the story is implausible. And the facts of the assistance to the attempted entry of a non-terrorist in the country are undisputed. For that reason, we request that the Court deny the petition for review and lift the state. Thank you very much. Thank you. Thank you. We'll give you three or four minutes. I'm sorry, Your Honor. We'll give you three or four minutes. Thank you. The government argues that there was a lack of support for Mr. Malconty's testimony about meeting Mr. Berwarth and the meeting that they had at Northgate Mall. And I want to remind the Court that Mr. Malconty's wife actually testified about meeting Mr. Berwarth at Northgate Mall and that Mr. Berwarth did ask her husband to actually make an overcare appointment on behalf of Salah Mohammed. The I.J. did not make an adverse credibility determination with regards to Mrs. Malconty's testimony. She was granted asylum. And she was granted asylum. The other thing is that the I.J. specifically found that Mr. Malconty was not a terrorist, that he did not provide material support to a terrorist organization, and that he did not provide any documentation or identification in support of terrorism or collide. And that finding was not reversed by the BIA in our appeal of this case. Now let's go back a little bit to the travel facilitator comments that Mr. Peachy made. And to the testimony of Agent Marks and Agent Smalley, that Mr. Malconty was in fact a terrorist travel facilitator. And that certainly weighed very heavily with the I.J. with the BIA and the I.J. in disbelieving Mr. Malconty's testimony. And if you look at that terrorist travel report, it talks about how travel facilitators use aliases, they forge IDs, they forge passports after searches of their homes, evidence of this type of activity is found among their possessions, that they had travel cachettes on their visas. And if you look at Mr. Malconty's activity, there is nothing to show that he was engaged in that type of activity. And that report details numerous travel facilitators. And it also details the surroundings, the facts surrounding Collide's attempted entry into the United States. There were two trips that were not reported, a trip to Germany and a trip to Pakistan, I think, or Afghanistan. Did those trips occur after he had come to the United States? Mr. Malconty's trips? Yes. And those trips were not reported. He actually was in Germany lawfully. He used his passport that has his name on it. And I can't remember at the time if it was before or after he legally changed his name. But either way, he didn't use an alias, he didn't travel on any fake passports. The government found no evidence of that, of those types of activities after they searched his home twice. And there's just nothing to show that he was engaged in the type of activities found in that terrorist travel facilitator report. Were they supposed to have been reported and they weren't? Or somehow I have the impression that it wasn't just that he took legitimate trips, but there was something that he, in connection with those trips, that he didn't do that he was supposed to. Now, Mr. Malconty did testify about making a trip to visit his family in Iraq. And at some point upon his exit from that country, he may have gone through another country. I'm not exactly sure what the record was on that, just because it was not something that the BIA relied upon in making its determination in this case. But if he'd just taken trips to those other places, there wouldn't have been anything wrong with that. The BIA certainly found nothing wrong with that, and they didn't use that as a basis for their finding. I'd just like to conclude that the government has the initial burden of proof in this case to show that Mr. Malconty was a danger to national security. And this court has a duty to review and determine whether in matter of law the government has met their burden in this case. Because the government failed to do so, the BIA improperly found that Mr. Malconty was statutorily barred from any type of asylum relief. Finally, it is also clear on this record that Mr. Malconty would have at least a 10% chance that Mr. Malconty would be persecuted if returned to Iraq, and therefore any remand to the BIA for determination on that issue is simply unwarranted and unnecessary and inefficient. Mr. Malconty has been detained in a maximum security prison for almost three years, and any further confinement would result in an extreme detriment to him and his family who are here today. Accordingly, we respectfully request that this court grant the petition for review and release Mr. Malconty from the custody of Immigration Customs and Enforcement.
judges: Reinhardt, Tashima, McKeown